AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

OCT 1 0 2019

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **'19 MJ4427**
Galaxy On5 Cellular Phone, )
Model SM-G550T, IMEI 358511074332598 )
(Target Device 1) )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated herein)

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Secs. 471-474, 1028-1029, 1344, 1543; 21 USC Secs. 841-846 | Counterfeiting, Identity Theft, Access Device Fraud, Bank Fraud, Doc. Fraud, and Distributing and Poss. with Intent to Distribute Contr. Subst. (and Conspiracy) |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jose Diego, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/9/19

_____
*Judge's signature*

City and state: San Diego, California          Hon. Linda Lopez, U.S. Magistrate Judge
*Printed name and title*

FILED

OCT 1 0 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT** '19 MJ4 27

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | **AFFIDAVIT OF SPECIAL AGENT JOSE DIEGO IN SUPPORT OF A SEARCH WARRANT** |

(1) Galaxy On5 Cellular Phone, Model SM-G550T, IMEI 358511074332598 (**Target Device 1**);

(2) Alcatel Raven LTE Cellular Phone, Model A574BL, IMEI 015295006585722 (**Target Device 2**);

(3) Black Dell Computer, Model D10U, Serial Number 6LGYLP2 (**Target Device 3**);

(4) Silver Hewlett Packard Laptop, Serial Number 8CG6365GCW (**Target Device 4**);

(5) Silver Apple Macbook Pro Model A1398, Serial Number C02PLR4KG8WN (**Target Device 5**)

(6) Black Dell Laptop, Model Latitude 5480, Serial Number BNGS4M2 (**Target Device 6**);

(7) SanDisk Micro SD Card (**Target Device 7**);

(8) Silver Kingston 16GB USB Drive (**Target Device 8**);

(9) Black and Silver Keurig USB Drive (**Target Device 9**); and

(10) Red and Black SanDisk 32GB USB (**Target Device 10**).

I, Special Agent Jose Diego, having been duly sworn, declare and state as follows:

# I.

# **INTRODUCTION**

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

| | The "Target Devices" | |
|---|---|---|
| **Device Designation** | **Device Description** | **Described in Attachment** |
| **Target Device 1** | Galaxy On5 Cellular Phone, Model SM-G550T, IMEI 358511074332598 | A-1 (Mobile Device) |
| **Target Device 2** | Alcatel Raven LTE Cellular Phone, Model A574BL, IMEI 015295006585722 | A-2 (Mobile Device) |
| **Target Device 3** | Black Dell Computer, Model D10U, Serial Number 6LGYLP2 | A-3 (Computer) |
| **Target Device 4** | Silver Hewlett Packard Laptop, Serial Number 8CG6365GCW | A-4 (Computer) |
| **Target Device 5** | Silver Apple Macbook Pro Model A1398, Serial Number C02PLR4KG8WN | A-5 (Computer) |
| **Target Device 6** | Black Dell Laptop, Model Latitude 5480, Serial Number BNGS4M2 | A-6 (Computer) |
| **Target Device 7** | SanDisk Micro SD Card | A-7 (Storage Device) |
| **Target Device 8** | Silver Kingston USB Drive | A-8 (Storage Device) |
| **Target Device 9** | Black and Silver Keurig USB Drive | A-9 (Storage Device) |
| **Target Device 10** | Red and Black SanDisk USB Drive | A-10 (Storage Device) |

and seize evidence of crimes, specifically violations of:

| The "Target Offenses" | |
|---|---|
| **Category of Offense** | **Specific Offenses** |
| Counterfeiting and Forgery (Title 18, United States Code, Chapter 25) | Section 471 (Making, Forging, or Counterfeiting Obligations or Securities of the United States) |
| | Section 472 (Passing or Uttering Counterfeit Obligations or Securities) |
| | Section 473 (Buying, Selling, or Transferring Counterfeit Obligations or Securities) |
| | Section 474 (Making Images for Counterfeiting Obligations or Securities) |
| Title 18, United States Code, Chapter 47 (Fraud and False Statements) | Section 1028 (Fraud in Connection with Identification Documents, Authentication Features, and Information) |
| | Section 1028A (Aggravated Identity Theft) |
| | Section 1029 (Fraud in Connection with Access Devices) |
| Mail Fraud and Other Fraud Offenses (Title 18, United States Code, Chapter 63) | Section 1344 (Bank Fraud) |
| Passports and Visas (Title 18, United States Code, Chapter 75) | Section 1543 (Forgery or False Use of Passport) |
| Drug, Abuse, Prevention, and Control (Title 21, United States Code, Chapter 13) | Sections 841 and 846 (Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the Same)) |

2.   The **Target Devices** were seized from Ali Tarokh at the time of his arrest, August 3, 2019, for State of California Narcotics violations at 8690 Aquarius Drive, San Diego, California 92126. The **Target Devices** are currently in the possession of Homeland

3

1   Security Investigations as evidence and being held in the Evidence Vault at 2255 Neils
2   Bohr, San Diego, California 92154.

3       3.       This search of the **Target Devices** supports an investigation and prosecution
4   of the Defendant for the **Target Offenses**. Based on the information below, there is
5   probable cause to believe that a search of the **Target Devices**, as described in Attachments
6   A-1 through A-10 will produce evidence of the **Target Offenses**, as described in
7   Attachments B-1 through B-10.

8       4.       The following is based upon my experience and training, investigation, and
9   consultation with other law enforcement agents and officers experienced in Criminal
10  fraudulent-related violations, including the **Target Offenses**. The evidence and
11  information contained herein was developed from interviews and my review of documents
12  and evidence related to this case. Because I make this affidavit for the limited purpose of
13  obtaining a search warrant for the **Target Devices**, it does not contain all of the information
14  known by me or other federal agents or other law enforcement officers regarding this
15  investigation, but only sets forth those facts believed to be necessary to establish probable
16  cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless
17  otherwise specified.

18                                          **II.**

19                      **AFFIANT'S EXPERIENCE AND TRAINING**

20      5.       I am a Special Agent with the United States Department of Homeland Security
21  United States Immigration and Customs Enforcement, Homeland Security Investigations
22  (HSI). I am currently assigned to the Document and Benefit Fraud Task Force, where my
23  duties include, but are not limited to, investigating fraudulent applications for immigration
24  benefits, the manufacture and sale of fraudulent immigration documents, and financial
25  exploitation of immigrants. I have held my current position with HSI since May 2019.
26  Previously, I was assigned to Contraband Smuggling Group III.

27      6.       Prior to becoming an HSI Special Agent, I was employed by Enforcement and
28  Removal Operations as an Officer and Agent from December 2012 to June 2016. I was

also employed by Customs and Border Protection as an Officer from October 2008 to December 2012, and by the United States Border Patrol as an Agent from December 2007 to August 2008.

7.     I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) training course. During these courses, I was trained in various types of criminal investigations, to include investigations involving fraudulent activities, the illegal trafficking of narcotics, currency, firearms and contraband.

8.     I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

9.     Throughout my career, I have been involved in dozens of criminal investigations for multiple violations of federal and state laws including, but not limited document fraud, narcotics smuggling, officer assaults, alien smuggling, and organized criminal activity. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical surveillance, working with informants, and the execution of arrest warrants.

10.     My training and experience in immigration enforcement has included the identification of fraudulent documents, identification of fraudulent identity attestations, methods used to manufacture and distribute fraudulent documents, and the investigation of persons involved in trafficking in such documents. In addition, I speak regularly with other investigators regarding the manner in which sellers of fraudulent documents operate.

11.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for an individual involved in utilizing a fraudulent identity and altered or fraudulent documents to work in concert with other individuals and to do so by utilizing cellular telephones to maintain

5

communications with co-conspirators in order to further their criminal activities. This is particularly true in cases where the individual utilizing a stolen identity and altered or fraudulent documents is obtaining them from a third party. Typically, the individual selling fraudulent identity information or documents/fraudulent documents will use a cellular phone to communicate with his or her customers, and also use a cellular phone to communicate with the parties acquiring the documents. This may include sending order request, meeting locations, and payment information via text message. The individual will remain in telephonic contact with co-conspirators to coordinate the delivery and/or sale of the identity/fraudulent documents.

### *Counterfeiting, Document Fraud, Bank/Credit Card Fraud, and Identity Theft*

12.     Based upon my training and experience as an HSI Special Agent, my participation in the investigation of individuals involved in false identity attestation and utilizing altered or fraudulent documents, the investigation of individuals involved in drug trafficking, and consultations with law enforcement officers experienced with document fraud investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

a.     Individuals involved in trafficking fraudulent identity information, counterfeit currency, and fraudulent documents will use cellular telephones because they are mobile, and they have instant access to telephone calls, text, email, Internet, social networking websites, and voice messages.

b.     Individuals involved in trafficking fraudulent identity information and fraudulent documents will use cellular telephones and computers because they are able to transmit the files containing templates for identification documents and currency, or personal identifying information, including credit card or bank account numbers, to be incorporated into the fraudulent documents, checks, and/or credit cards.

c.     Individuals involved in trafficking fraudulent identity information and fraudulent documents will use computers to create, modify, and/or store files or images

containing templates for counterfeit currency, identification documents, and/or checks. They may also use mobile storage devices such as USB drives to store these templates.

d.    Individuals involved in trafficking fraudulent identity information and fraudulent documents and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations to facilitate its delivery.

e.    Individuals involved in trafficking fraudulent identity information and fraudulent documents will use cellular telephones to direct couriers to synchronize an exact drop off and/or pick up time of their illegal cargo.

f.    Individuals involved in trafficking fraudulent identity information and fraudulent documents will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units.

g.    Individuals involved in trafficking fraudulent identity information and fraudulent documents will access the internet through their mobile devices and/or computers to open various accounts utilizing the fraudulent identity information.

h.    Individuals involved in trafficking fraudulent identity information and bank or credit card fraud will use cellular telephones, computers, and/or storage devices to create, send/receive, or store files or data containing personal identifying information, such as names, dates of birth, social security numbers, and/or account numbers to use in creating fraudulent identity documents, checks, or credit cards.

i.    Individuals involved in trafficking fraudulent identity information and credit cards will use computers to connect to external devices, such as magnetic strip readers/writers to use or manufacture fraudulent credit cards.

j.    Individuals involved in counterfeiting currency will often use files or images saved on a computer and/or storage device to print the counterfeit currency.

k.    The use of cellular telephones by individuals involved in trafficking fraudulent identity information and fraudulent documents tends to generate evidence that

is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

13.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in fraudulent identity information and fraudulent documents investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  I have also learned that computers and storage devices generally contain electronic records such as images/files, web history, documents containing personal identifying information, or communications such as emails.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone, computer, or storage device. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones, computers, or storage devices associated with document fraud, bank fraud, credit fraud and/or counterfeiting investigations yield evidence.

a.     tending to identify the individuals involved in manufacturing the fraudulent documents, checks, credit cards, or counterfeit currency;

b.     tending to identify the means or methods used to manufacture fraudulent documents, checks, credit cards, or counterfeit currency;

c.     tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the manufacture, transportation or sale of fraudulent documents, checks, credit cards, or counterfeit currency within the United States;

d.      tending to identify co-conspirators, criminal associates, or others involved in manufacturing, transporting, and/or selling the fraudulent documents, checks, credit cards, or counterfeit currency;

e.      tending to identify travel to or presence at locations involved in manufacturing, transporting, and/or selling fraudulent documents, checks, credit cards, or counterfeit currency;

f.      tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

g.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

***Distributing and Possessing with the Intent to Distribute Controlled Substances***

14.     Based upon my training and experience as an HSI Special Agent, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

a.      Drug traffickers and their co-conspirators will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.      Drug traffickers and their co-conspirators will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers.

c.      Drug traffickers and their co-conspirators will use cellular/mobile telephones to arrange times and places to meet with customers to deliver illegal drugs, and to arrange times and places to meet with suppliers to receive illegal drugs.

d.      Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the

presence and posture of marked and unmarked units, as well as ongoing enforcement operations in their area.

        e.    Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

        f.    Drug traffickers and their co-conspirators often use cellular/mobile telephones to record money owed to customers and suppliers and as evidence of past orders received and/or delivered.

        g.    The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

15.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a criminal subject's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

16.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. I have also learned that computers and storage devices generally contain electronic records such as images/files, web history, documents containing personal identifying information, or communications such as emails. This information can be stored within disks, memory cards,

deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone, computer, or storage device. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones, computers, or storage devices associated with drug distribution investigations yield evidence:

a.    tending to identify co-conspirators that possess with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances within the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

d.    tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    RESPONSE TO OVERDOSE DEATH AND ARREST OF TAROKH**

17.    On August 3, 2019 at approximately 11:21 a.m., San Diego Police Department (SDPD) officers responded to a radio call about a possible deceased person from a drug overdose at 8690 Aquarius Drive, San Diego, California 92126. SDPD Sargent Dempsey

11

arrived at 11:46 a.m. and saw the front door of the residence was wide open. Sargent Dempsey saw a male walking out of the residence and down the walkway.

18.    Sargent Dempsey contacted the male, handcuffed him, and detained the male without incident. The male was later identified as Ali Tarokh. Tarokh stated he had been living at the residence for one day after answering a Craigslist posting from "Chris,"[1] who Tarokh described as an Asian male with shaggy hair. It was later learned that Tarokh was on formal (reporting) probation with Fourth Amendment waiver stipulations in two separate criminal cases (SCD278267 and SCD266842). Additionally, a 2004 silver Lexus ES 330 bearing California license plate 5FKE632—and registered under Tarokh's name— was parked in the driveway to the residence.

19.    SDPD officers subsequently entered the residence and discovered a deceased female in a bedroom at the end of the main hallway at the west end of the house. This female was later identified as S.L.B. The SDPD officers also found a California identification card belonging to Mark Anonas Arcelao. Records checks showed that Arcelao had an outstanding no bail felony arrest warrant. The SDPD officers contacted the San Diego County Medical Examiner's Office and Drug Enforcement Administration (DEA) Narcotics Task Force (NTF) Team 10 (the DEA Team assigned to investigate overdose deaths). Members of DEA Team 10 and an investigator from the Medical Examiner's Office responded to the scene.

20.    Upon arriving to the scene, the Medical Examiner's Investigator (MEI) did not find any signs of forced entry or foul play. The MEI also discovered a syringe under S.L.B.'s pillow.

21.    After arriving on the scene, agents and officers from NTF Team 10 surveyed the residence at 8690 Aquarius Drive. It is a single story, four bedroom, two bathroom home. One of the four bedrooms, where S.L.B.'s body was found, appeared to have been occupied by S.L.B. and Arcelao. Another one of the bedrooms appeared to have been

---

[1] A subsequent investigation would identify "Chris" as Christopher Chin (believed to be an alias).

occupied by Tarokh. Another bedroom appeared to be occupied by individuals who were not identified until later, and the fourth bedroom was not occupied. The remainder of the house had few furnishings, primarily just a few chairs.

22.     During a search of Tarokh's bedroom, members of NTF Team 10 discovered and seized a functioning digital scale with a white residue from inside a jacket pocket, which had been located in a large black with yellow lid storage tub situated under the desk and assorted drug paraphernalia such as a metallic heating cap and suspected snorting tubes (i.e., tubes used to snort lines of powder, sometimes called "tooters").

23.     During a search of Tarokh's vehicle, agents and officers discovered and seized ten and one-half Alprazolam (Xanax) bars from a lock box in the rear driver's side seat (the key for this lock box was found on Tarokh's key chain). They also found several small clear plastic baggies that contained several different substances, including an off-white crystalline substance (suspected methamphetamine), a brownish, rock-like substance (suspected heroin) and a white powdery substance (presumptively tested positive for the presence of fentanyl). These baggies were hidden within a small black case, further secreted within a box of new dishware, also in the rear driver's side seat area. NTF Team 10 members also discovered a second functioning digital scale from the vehicle's center console area.

24.     In addition, agents and officers discovered and seized a large number of evidentiary items related to suspected identity theft, counterfeiting, and other fraud and credit/financial related criminal activity as described below.

**B.     ITEMS RELATING TO DOCUMENT FRAUD OR IDENTITY THEFT**

25.     Inside Tarokh's vehicle, agents and officers confiscated a Colorado driver's license bearing the name "Joshua Eric Aguilar Wynn" that had been modified to include Tarokh's photograph. Agents and officers also discovered three Community Banks of Colorado visa debit cards bearing the name "Joshua Wynn." Based on my training, experience, and consultation with other law enforcement agents, there is probable cause to

believe that Tarokh may have used this fake identification document to facilitate his fraudulent use of the credit cards issued under the name "Joshua Wynn."

***Fraudulent Identification and Cards Bearing Name "Joshua Wynn"***



26.    Agents and officers also discovered three United States passports, two of which were altered to contain different photographs. One of the altered passports bore the name "M.C.B." had been altered to include Tarokh's photograph. The other two passports bore the names "A.C.G." and "A.L.T." The passport bearing the name "A.C.G." had been altered to include a different individual's photograph.

27.    Agents and officers also discovered nine California driver's licenses and one Florida driver's license in Tarokh's vehicle. One of the California licenses bore the name of J.L.D. Jr. and appeared to have had an altered photograph placed on it, and then the face of the photograph scratched off.

28.    Agents and officers also discovered one counterfeit Florida driver's license and one counterfeit Arizona driver's license.

29.     Agents and officers also discovered multiple checks in Tarokh's vehicle. Many of the checks were made out to the names of other individuals and some of the checks had been altered to remove the name in the "pay to the order of" field as pictured below. Based on my training, experience, and consultation with other law enforcement, there is probable cause to believe Tarokh was altering these checks to make them payable to a different name to facilitate fraudulently converting them into currency.

***Altered Check Found in Tarokh's Possession***



30.     Agents and officers also found pieces of paper that contained the background of a check with no name, account information or text on them. My open-source research indicates this type of "check paper" can be readily purchased online. Among the pieces of blank check paper, there were individual checks that were printed on it, including a check bearing the name "A.T." (the same name listed on one of the passports as A.L.T.) and associated with an account at Pacific Mercanitle Bank.

## C.     ITEMS RELATING TO COUNTERFEITING U.S. CURRENCY

31.     Agents and officers discovered twenty "washed" one-dollar bills. Based on my consultation with other law enforcement agents, individuals involved in counterfeiting may remove the ink from one-dollar bills so that they may use the paper to print higher denomination bills.

32.     Agents and officers also discovered six incomplete counterfeit twenty-dollar bills. One side of these bills had the markings of a twenty-dollar bill printed on them, while

15

the other side was blank. On the blank side, the faint markings of a one-dollar bill were still visible. This leads me to believe that Tarokh was using the blank paper from "washed" one-dollar bills to counterfeit twenty-dollar bills.[2]

33.     Agents and officers discovered one counterfeit detector pen in Tarokh's vehicle and a piece of paper with the front of two twenty-dollar pills printed on it. Tarokh also had sheets of paper with adhesive on them in a rectangular shape, the size of U.S. currency.  Each rectangle had faint markings on it that appeared to be consistent with the printing on one-hundred dollar bills. I believe Tarokh was using the adhesive on these sheets to attach the washed one dollar bills so he could run them through a printer to print the markings of higher denomination bills on the paper from the washed one dollar bills.

**D.    ITEMS FOR PRODUCING COUNTERFEIT CURRENCY, CHECKS, AND DOCUMENTS**

34.     Agents and officers discovered a large variety of equipment and materials associated with the production of counterfeit United States currency and/or manufacturing or altering identification documents.

35.     Agents and officers discovered multiple printers, laptop computers, a light table, a MSR X6 magnetic stripe card reader/writer, and a large assortment of specialty paints, clear topcoat coating, a blow torch, blow dryer, sponge brushes, and cutting boards. These materials were packaged together in organized cases that leads me to believe Tarokh used these materials together for manufacturing fraudulent documents and counterfeiting United States currency.

36.     My open-source research indicates that the MSR X6 is a bluetooth magnetic stripe credit card reader/writer that is designed to be portable. Bluetooth devices such as this are typically designed to pair with another electronic device, such as a laptop or a cellular telephone.

---

[2] When Tarokh was later booked into jail, agents were attempting to place a fifty-dollar bill in Tarokh's possession into a machine used to inventory each inmate's money. After the machine rejected the fifty-dollar bill, agents inspected the fifty-dollar bill more closely and identified it as counterfeit.

37.    **Target Device 1**, **Target Device 2**, and **Target Device 5** were seized from a black laptop bag found in the trunk of Tarokh's vehicle, along with an Apple iPad that appeared to be brand new and still in the box.[3]

38.    **Target Device 3** was found in a black Pelican case, along with a computer keyboard, mouse pad, blow dryer, portable LED light, wood cutting boards, a Canon Pixima printer/scanner, ruler, spray paint, glass jars, and empty plastic squeeze bottles. The black Pelican case was in the trunk of Tarokh's vehicle.

39.    **Target Device 4** was found in the trunk of Tarokh's vehicle.

40.    **Target Device 6** was found in a brown laptop bag along with the blank "check paper," counterfeit money templates for one-hundred dollar pills, a holder containing six incomplete counterfeit twenty-dollar bills, twenty "washed" one-dollar bills, and altered checks. The brown laptop bag was found in the trunk of Tarokh's vehicle.

41.    **Target Device 7** was removed from a black Epson printer/scanner model C351C.  The printer was stored in a black container, along with three other printers, and a white Cricut light table CLP7000. The black container was found on the rear, driver side seat of Tarokh's vehicle.

42.    **Target Device 8** and **Target Device 9** were found on a key chain inside the pocket of a Dockers brand peacoat that was in a black plastic pin under the desk in Tarokh's bedroom.

43.    **Target Device 10** was found in a box on a shelf in Tarokh's bedroom.

**E.    IDENTIFICATION OF POTENTIAL VICTIMS**

44.    As part of my investigation into Tarokh's fraud, I contacted the owners of two of the passports found in Tarokh's vehicle: (1) A.L.T., and (2) A.C.G.

---

[3] There was another cellular telephone seized from Tarokh's person at the time of his arrest. Agents and officers from DEA Team 10 obtained a state warrant to search that phone as part of their investigation into the overdose death of S.L.B.

17

*A.L.T.*

45.     I first contacted A.L.T. on September 9, 2019, and met with her in San Diego, California. A.L.T. presented me with her Connecticut driver's license to confirm her identity.

46.     A.L.T. said she had received a letter in May or June of 2019 regarding the purchase of a $900 computer at Best Buy, and then another letter regarding $430 worth of charges at Victoria's Secret. A.L.T. said she did not make those purchases and notified the stores of the credit card fraud. She said she also filed a police report.

47.     A.L.T. said she had last used her passport in November of 2018 when she traveled to Mexico. She said she did not report her passport stolen because she thought she may have just misplaced it, left it in her friend's car, or possibly left it at the port of entry after she was sent to secondary inspection.

48.     When A.L.T. was asked if a relative or friend could have taken her passport, she said her ex-boyfriend L.V. could have taken it and that they broke up in February of 2019 and stopped speaking entirely in April of 2019.

49.     A.L.T. was shown a photograph of checks from Pacific Mercantile bank that had her name on them, and she said they were not her checks as she only had one bank account with Bank of America.  Those checks were found in Tarokh's possession at the time of his arrest.

*A.C.G.*

50.     I first contacted A.C.G. on September 10, 2019 and met with him at his place of business. A.C.G. presented me a California driver's license to confirm his identity.

51.     A.C.G. explained that four to five vehicles had been broken into while parked at his business's parking lot in January of 2019. He said his vehicle was burglarized and his passport had been in the center console and was taken. He said he reported the burglary to the San Diego Police Department.

18

1    52.    After the burglary, A.C.G. checked his credit report and learned that someone
2    had opened up a Best Buy credit card under his name and purchased a television for
3    approximately $2,000.

4    **F.    TAROKH'S POST-*MIRANDA* STATEMENT**

5    53.    During a recorded, post-*Miranda* interview, Tarokh admitted that the Xanax
6    and the other drugs found in his car belonged to him and also advised that the white
7    powdery substance described above was in fact fentanyl, which he elaborated had been
8    "cut" with "Benefiber." Tarokh also admitted that he had furnished approximately 1/20th
9    of a gram of fentanyl to a female acquaintance, Megan Joy Seman, who had been present
10   at the residence. Tarokh claimed he had a conversation with Seman that led him to believe
11   she may have provided some of the fentanyl he gave her to S.L.B.

12   54.    Additionally, Tarokh claimed that the fraud related items found in his vehicle
13   did not belong to him but rather to a Muhammad Ali Jalali (a friend). However, Tarokh did
14   admit that he had intended to get involved in furtherance of related criminal activity but
15   alleged to have not yet started to do so. Tarokh claimed to have not conducted any
16   transactions with the checks, but had attempted to make fictitious checks to cash, though
17   had not been successful yet. After being asked if any of the hard drives on the laptops were
18   going to have any templates for U.S. currency, Tarokh stated he had gotten those items
19   from a friend and had not "dived" into that yet. Tarokh also stated his friend knew how to
20   do it but claimed to not have any templates.

21   55.    After being told it was a significant amount of stuff and that it did not appear
22   as if someone was just starting to dabble, Tarokh chuckled and stated "yeah, exactly."
23   Tarokh alleged that most of the stuff was his friend's and not his. Tarokh stated his friend
24   is homeless and he was storing it in his car for him. Tarokh confirmed his friend was
25   basically getting him into that, and was showing him, but claimed that all of that stuff was
26   not his but rather his friend's.

27   56.    When asked if the credit card readers and similar items were associated,
28   Tarokh replied "yeah" and stated that nothing had been created with those things. Tarokh

1   added that the currency stuff was not his and continued by stating that regarding the credit
2   card machine and the reader/writer, Christopher Chin was showing him the ropes as to how
3   to use those, but he was never successful at it. Tarokh was asked if it was for skimming
4   credit card numbers or information, and he responded in the affirmative, and added it was
5   for making credit cards or something like that. Tarokh said he had known Chin for
6   approximately one to two years.

7       57.     Regarding a search of Tarokh's wallet, a Walmart debit card in the name of
8   "Joshua Wynn" was discovered inside. When asked who Joshua Wynn was, Tarokh stated
9   it was a card he had found on the ground. During the search of Tarokh's vehicle, Joshua
10  Wynn's Colorado Driver's License was discovered with a substitute photo of Tarokh.

11      58.     Subsequently, Tarokh was transported by NTF to be booked into San Diego
12  County Jail (SDCJ). During booking, a counterfeit fifty-dollar ($50) bill was removed and
13  seized from Tarokh's pants pocket.

14      59.     Tarokh was charged with California Health and Safety (H&S) Code section
15  11351 – possession of fentanyl for sale, H&S 11375(b)(1) – possession of Alprazolam for
16  sale, H&S 11377(A) – possession of methamphetamine, H&S 11364 – possession of drug
17  paraphernalia and Penal Code (PC) 1203.2(A) – probation violation: re-arrest/revocation.

18                                              **IV.**

19                    **METHODOLOGY FOR TARGET DEVICES 1 AND 2**

20      60.     It is not possible to determine, merely by knowing the cellular telephone's
21  make, model and serial number, the nature and types of services to which the device is
22  subscribed, and the nature of the data stored on the device. Cellular devices today can be
23  simple cellular telephones and text message devices, can include cameras, can serve as
24  personal digital assistants and have functions such as calendars and full address books and
25  can be mini-computers allowing for electronic mail services, web services and rudimentary
26  word processing. An increasing number of cellular service providers now allow for their
27  subscribers to access their device over the internet and remotely destroy all of the data
28  contained on the device. For that reason, the device may only be powered in a secure

environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

61. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

62. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## V.

## METHODOLOGY FOR TARGET DEVICES 3 THROUGH 10

63. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

1  ***Forensic Imaging***

2          a.      After securing the premises, or if sufficient information is available pre-
3  search to make the decision, the executing agents will determine the feasibility of obtaining
4  forensic images of electronic storage devices while onsite. A forensic image is an exact
5  physical copy of the hard drive or other media. A forensic image captures all the data on
6  the hard drive or other media without the data being viewed and without changing the data.
7  Absent unusual circumstances, it is essential that a forensic image be obtained prior to
8  conducting any search of the data for information subject to seizure pursuant to this
9  warrant. The feasibility decision will be based upon the number of devices, the nature of
10  the devices, the volume of data to be imaged, the need for and availability of computer
11  forensics specialists, the availability of the imaging tools required to suit the number and
12  nature of devices found, and the security of the search team. The preference is to image
13  onsite if it can be done in a reasonable amount of time and without jeopardizing the
14  integrity of the data and the agents' safety. The number and type of computers and other
15  devices and the number, type, and size of hard drives are of critical importance. It can take
16  several hours to image a single hard drive - the bigger the drive, the longer it takes. As
17  additional devices and hard drives are added, the length of time that the agents must remain
18  onsite can become dangerous and impractical.

19          b.      If it is not feasible to image the data on-site, computers and other
20  electronic storage devices, including any necessary peripheral devices, will be transported
21  offsite for imaging. After verified images have been obtained, the owner of the devices will
22  be notified and the original devices returned within forty-five (45) days of seizure absent
23  further application to this court.

24  ***Identification and Extraction of Relevant Data***

25          c.      After obtaining a forensic image, the data will be analyzed to identify
26  and extract data subject to seizure pursuant to this warrant. Analysis of the data following
27  the creation of the forensic image can be a highly technical process requiring specific
28  expertise, equipment and software. There are thousands of different hardware items and

software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

    d. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record—e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other

computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.      It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.      Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits

1   that must be individually examined for relevance. And, once reviewed, relevant data leads
2   to new keywords and new avenues for identifying data subject to seizure pursuant to the
3   warrant.

4          g.      Based on the foregoing, identifying and extracting data subject to
5   seizure pursuant to this warrant may require a range of data analysis techniques, including
6   hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude
7   certain data from analysis, such as known operating system and application files. The
8   identification and extraction process, accordingly, may take weeks or months. The
9   personnel conducting the identification and extraction of data will complete the analysis
10  within one-hundred twenty (120) days of this warrant, absent further application to this
11  court.

12         h.      All forensic analysis of the imaged data will employ search protocols
13  directed exclusively to the identification and extraction of data within the scope of this
14  warrant.

**VI.**

**CONCLUSION**

17  64.    Based on all of the facts and circumstances described above, my training and
18  experience, and consultations with other law enforcement officers, there is probable cause
19  to conclude that Ali Tarokh utilized the **Target Devices** to facilitate the **Target Offenses**.

20  65.    Given that A.C.G. stated his United States passport had been stolen in or
21  around January of 2019, and then learned of fraudulent credit purchases at Best Buy under
22  his name, there is probable cause to believe that evidence of the aforementioned offenses
23  exists on the **Target Devices** for the period of January 1, 2019 to August 3, 2019.

24  66.    Because the **Target Devices** were promptly seized during the investigation of
25  Defendants' fraudulent activities and have been securely stored, there is probable cause to
26  believe that evidence of illegal activity committed by Defendants continues to exist on the
27  **Target Devices**.

28

67.     Based upon my experience and training, consultation with other agents in fraudulent identity information and fraudulent documents investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 through B-10(incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 through A-10 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 through A-10, and seize the items listed in Attachments B-1 through B-10.

I declare under penalty of perjury that the foregoing is true and correct.


_____
Special Agent Jose Diego
Homeland Security Investigations


Sworn to and subscribed before me this _____ day of October, 2019.

_____
HONORABLE LINDA LOPEZ
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violations of the **Target Offenses** in the table on the following page.

| Device Designation | Device Description | Type of Device |
|---|---|---|
| **Target Device 1** | Galaxy On5 Cellular Phone, Model SM-G550T, IMEI 358511074332598 | Mobile Device |

**Target Device 1** is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and is being stored in the vault located at 2255 Niels Bohr Court, in San Diego, California.

## ATTACHMENT A-1 (cont.)

| The "Target Offenses" | |
|---|---|
| **Category of Offense** | **Specific Offenses** |
| Counterfeiting and Forgery (Title 18, United States Code, Chapter 25) | Section 471 (Making, Forging, or Counterfeiting Obligations or Securities of the United States) |
| | Section 472 (Passing or Uttering Counterfeit Obligations or Securities) |
| | Section 473 (Buying, Selling, or Transferring Counterfeit Obligations or Securities) |
| | Section 474 (Making Images for Counterfeiting Obligations or Securities) |
| Title 18, United States Code, Chapter 47 (Fraud and False Statements) | Section 1028 (Fraud in Connection with Identification Documents, Authentication Features, and Information) |
| | Section 1028A (Aggravated Identity Theft) |
| | Section 1029 (Fraud in Connection with Access Devices) |
| Mail Fraud and Other Fraud Offenses (Title 18, United States Code, Chapter 63) | Section 1344 (Bank Fraud) |
| Passports and Visas (Title 18, United States Code, Chapter 75) | Section 1543 (Forgery or False Use of Passport) |
| Drug, Abuse, Prevention, and Control (Title 21, United States Code, Chapter 13) | Sections 841 and 846 (Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the Same)) |

## ATTACHMENT B-1

Authorization to search **Target Device 1**, described in Attachment A-1, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 1** for evidence described below. The seizure and search of **Target Device 1** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 1, 2019 to August 3, 2019:

### *Counterfeiting, Document Fraud, Bank/Credit Card Fraud, and Identity Theft*

a. tending to identify the individuals involved in manufacturing the fraudulent documents, checks, credit cards, or counterfeit currency;

b. tending to identify the means or methods used to manufacture fraudulent documents, checks, credit cards, or counterfeit currency;

c. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the manufacture, transportation or sale of fraudulent documents, checks, credit cards, or counterfeit currency within the United States;

d. tending to identify co-conspirators, criminal associates, or others involved in manufacturing, transporting, and/or selling the fraudulent documents, checks, credit cards, or counterfeit currency;

e. tending to identify travel to or presence at locations involved in manufacturing, transporting, and/or selling fraudulent documents, checks, credit cards, or counterfeit currency;

f. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## ATTACHMENT B-1 (cont.)

### *Distributing and Possessing with the Intent to Distribute Controlled Substances*

a.  tending to identify co-conspirators that possess with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

b.  tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances within the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

d.  tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of the **Target Offenses** listed in Attachment A-1.